IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CAPRI TUCKER,**                      Case No. 1:18 CV 1039
**ON BEHALF OF PCW, JR.,**

     Plaintiff,                      Judge Benita Y. Pearson

     v.                               Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                   REPORT AND RECOMMENDATION

## INTRODUCTION

Capri Tucker ("Tucker") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of her child, PCW, Jr. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff was previously determined to be disabled as of June 1, 2010 at the age of two. (Tr. 76-105). In November 2014, the Social Security Administration performed a continuing disability review and found Plaintiff (then five years old) was no longer disabled. (Tr. 69, 106-09). That determination was upheld on reconsideration, *see* Tr. 121-38, and Tucker then requested a hearing before an ALJ. (Tr. 139). On April 5, 2016, Tucker appeared before an ALJ at a hearing, but requested a postponement in order to obtain representation after the ALJ explained her rights. *See* Tr. 60-68; *see also* Tr. 151. Four months later, on August 9, 2016, Tucker and Plaintiff appeared

and testified at a hearing before the ALJ without representation. (Tr. 35-59). On March 31, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-28). The Appeals Council denied Tucker's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); 20 C.F.R. §§ 416.1455, 416.1481. Tucker timely filed the instant action on behalf of Plaintiff on May 4, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background

Born in 2009, Plaintiff was two years old when he was found disabled (Tr. 82), based on a diagnosis of "failure to thrive" (Tr. 69, 482). He was five years old at the time the Agency found his disability had ceased. (Tr. 106). At that time, the Agency explained that Plaintiff "now has a near normal BMI w/o any chronic phys[ical] health conditions" and that his behavioral issues did not render him disabled. (Tr. 69); *see also* 123-30 (Hearing Officer's decision).

Educational Records

In March 2014, providers from the Cleveland Municipal School District completed an IEP[1] progress report. (Tr. 425-27). Providers noted Plaintiff was making adequate progress toward his goals. *See id.* His teacher commented that he "has been a pleasure", and "loves to play with the other students in the classroom", and was "steadily improving with all of his goals", but that "[r]ecently . . . his attitude ha[d] gone down" and he had trouble sharing. (Tr. 426-27).

In April 2014, Cleveland Public Schools completed an Evaluation Team Report. (Tr. 429-47; 465-78). Therein, evaluators found Plaintiff's auditory and expressive communication skills were comparable to his peers. (Tr. 436). He was "on track with understanding and using basic concepts within the classroom for following directions, answering questions effectively . . ., and

---

1. IEP stands for "Individualized Education Program."

following routines. (Tr. 437). Plaintiff had no educational needs involving his language/communication skills. *Id.* Plaintiff's teacher reported he was aggressive and unable to sit still for any length of time. (Tr. 438). He was impulsive and had a short attention span, and "thrives in a structured environment where he is provided with enrichment that is at his instructional level." (Tr. 440). "Without continued intensive interventions", Plaintiff would "be unable to progress through the curriculum at the pace of same-age peers." (Tr. 444).

Plaintiff was assigned an IEP by the Cleveland Municipal School District for April 2014 through April 2015. (Tr. 449-61). He was to spend most of his kindergarten day in a general education classroom, but attend a resource room classroom for language arts, math, and "[a]ttending/[r]outines" for small group and individual instruction. (Tr. 461).

An IEP for April 2015 through April 2016 showed Plaintiff made progress in phonics, and writing, but was still behind his peers. (Tr. 417-18). Plaintiff remained in a regular classroom, but received language arts and math with an intervention specialist. (Tr. 523).

In March 2016 (first grade), Plaintiff's test scores were higher than average in reading, foundation skills, literature and informational, language, writing, and vocabulary. (Tr. 319). His math scores were mostly high average, with one low average score. *Id.* He had difficulty with phonetics, sight words, and writing with correct grammar and punctuation. *Id.* A reading delay affected his oral fluency and comprehension of reading material. (Tr. 323). Because of this, he "require[d] intensive direct instruction to access the general education classroom." *Id.* The IEP stated Plaintiff would continue to work in the resource room for language arts, and math. (Tr. 328).

In November 2016, Plaintiff underwent a reevaluation with Avon Lake City Schools. (Tr. 344-50, 368-74). The Evaluation Team Report noted Plaintiff was "pleasant and upbeat" but at times "would become silly and frequently asked when the testing would be completed." (Tr. 346).

He lost focus when presented with more challenging tasks, was "easily distracted", and "constantly moving". *Id.* Testing revealed mostly low-average to average scores, with some below average scores. *See* Tr. 346-47. He had average fluid reasoning and processing speed, but below average working memory. (Tr. 348). Plaintiff needed to increase phonological processing, sight word recognition, decoding, spelling/written expression, math reasoning, and vocabulary skills. *Id.* A teacher indicated he was below grade level in all areas of the curriculum. (Tr. 349). Plaintiff had problems with aggression at school. (Tr. 369). The report noted that: "Overall, [Plaintiff's] hyperactivity, attention problems, learning problems, atypicality, conduct problems, aggression, anxiety, depression, executive functioning, anger control, emotional self-control, leadership skills, functional communication skills, and activities of daily living may be of a concern." *Id.* He needed to increase his ability to remain calm and focused, follow rules, stay on task, manage his emotions, complete multi-step tasks, and communicate. (Tr. 370). Plaintiff's "overall level of adaptive behavior" was "moderately low to adequate" and in the 21st percentile. (Tr. 371).

Another IEP was completed for the time period of November 2016 through November 2017. (Tr. 375-82). Plaintiff's reading, math, and written expression skills were in the low average range, and his math computation and reading skills (fluency/comprehension) were average. (Tr. 376). His communication and language skills (grammar/vocabulary) were below average, and his receptive language skills were average. *Id.* Plaintiff continued to receive daily reading, writing, and math instruction in the resource room; he also received speech services. (Tr. 379-80).

<u>Medical Records</u>

In September 2014, Plaintiff (then five years old) underwent an evaluation with clinical psychologist Deborah Koricke, Ph.D. (Tr. 480-88). Dr. Koricke noted Plaintiff "put forth consistently good effort and appeared eager to interact, but he is difficult to keep on task." (Tr.

483). He was not taking medication for ADHD. *Id.*; *see also* Tr. 486. He was impulsive, distracted, and hyperactive, but had no difficulty understanding simple or complex directions, or expressing thoughts and feelings. (Tr. 483-84). Dr. Koricke diagnosed ADHD, combined presentation. (Tr. 486). She opined Plaintiff would have difficulty learning and retaining new information, sustaining attention for long periods of time, and sustaining attention for interpersonal interactions due to ADHD symptoms. (Tr. 486-87). He was also likely to be disruptive and would require a higher level of supervision to complete tasks. (Tr. 487). Finally, she noted he was able to complete self-care activities with structure and reminders from his mother. (Tr. 488). Plaintiff had a limited frustration tolerance and acted impulsively, but was responsive to redirection and discipline. *Id.*

In October 2014, State agency providers[2] reviewed Plaintiff's records and offered an opinion regarding his functional limitations. (Tr. 489-96). They opined Plaintiff had a marked limitation in the domain of attending and completing tasks, but less than marked limitation in the domains of acquiring and using information, interacting and relating with others, and caring for self. (Tr. 491-92). They opined Plaintiff had no limitation in the domains of moving about and manipulating objects or health and physical well-being. (Tr. 492). In March 2015, State agency providers[3] again reviewed Plaintiff's records and reached the same conclusions. (Tr. 506-11).

In February 2015, Plaintiff saw social worker Eureka Marshall, LSW. (Tr. 499-502). Tucker brought Plaintiff for an assessment due to his difficulty focusing in school and inability to sit still, as well as aggressive behavior with peers and family members. (Tr. 500). Ms. Marshall diagnosed ADHD, combined type. (Tr. 502).

---

2. These providers were Frank Stroebel, M.D., Kristen Haskins, Psy.D., and Lisa Lynch, M.A., CCC/SLP. *See* Tr. 490.
3. These providers were Bruce Mirvis, M.D., Denise Rabold, Ph.D./M.A., and Janet Soder, Psy.D. *See* Tr. 507.

In August 2015, Plaintiff underwent a psychiatric assessment with Vince Caringi, M.D., to evaluate disruptive behavior. (Tr. 534-35). Plaintiff's diagnosis remained ADHD, combined type, and Dr. Caringi planned to start medication. *Id.*

Plaintiff was prescribed medication for his ADHD. *See* Tr. 555-56. At a follow-up visit in November 2015, Plaintiff's mother reported the medication "was very helpful" with Plaintiff's ability to focus at school. (Tr. 549). However, he had run out of medication three weeks prior and "since then ha[d] been getting into more trouble at school." *Id.* After consultation with Dr. Caringi, a nurse instructed Tucker to re-start, and then increase, Plaintiff's medication. *Id.*

In January 2016, Tucker reported "that she never made the adjustment" to Plaintiff's medication dose and that he had some daytime sedation. (Tr. 626). She also reported his school behavior improved, though he could still be irritable and easily frustrated. *Id.*

In February 2016, Plaintiff saw Phyllis Elinson, M.D. (Tr. 610). Plaintiff had a previous diagnosis of failure to thrive, and was a picky eater. *Id.* Dr. Elinson assessed a vitamin D deficiency, tinea capitis, a food aversion, and constipation. (Tr. 611). She also noted Plaintiff had behavioral problems, for which he received counseling and medication. (Tr. 610).

In March, Tucker reported Plaintiff's behavior worsened, and he required frequent redirection at school. (Tr. 628). He was impulsive and had recently cut his own hair. *Id.*

In May 2016, Dr. Caringi noted Plaintiff improved academically, but still got in trouble at school for "distracting and defiant behaviors." (Tr. 630). He noted Plaintiff benefitted academically from stimulant medication and behaviorally from non-stimulant medication, but "[d]espite discussion and plan to do so in the past, he never adhered to both medications together." *Id.* Dr. Caringi instructed Plaintiff to "resume Intuniv" and "continue Vyvanse". (Tr. 631).

A July 2016 report from the Cuyahoga County Board of Developmental Disabilities found Plaintiff had substantial functional limitation in mobility, receptive and expressive language, self-care, self-direction and was therefore eligible for services. (Tr. 669).

Plaintiff saw Dr. Caringi again in September. (Tr. 632). Tucker "maintained his medications over the summer and since resuming school has been getting good reports" and "completing his assignments." *Id.* Tucker reported Plaintiff was "episodically hyperactive". *Id.*

Hearing Testimony[4]

Tucker appeared at the first hearing on April 5, 2016 without a representative, and the hearing was adjourned to allow her time to obtain representation. *See* Tr. 62-67.

Tucker, accompanied by Plaintiff, appeared at the second hearing on August 9, 2016 before the same ALJ. (Tr. 37). Plaintiff lived with his mother, and nine-year-old sister. (Tr. 47). He also had five siblings on his father's side, with whom he did not always get along. (Tr. 47-48). He sometimes played with his sister, but often hit her. (Tr. 56).

Tucker testified Plaintiff had a new IEP as of March 2016; he finished first grade, and was entering second, in a mix of regular and special education classes. (Tr. 50-51). He had never been suspended, but often went to the principal due to behavioral problems. (Tr. 52). Tucker stated she had to go to school "[a]lmost every day" the prior year because of behavioral problems. *Id.* Plaintiff had trouble keeping his hands to himself, staying seated, and remaining focused. (Tr. 53).

Tucker testified Plaintiff's ability to focus (and, as a result, his grades) improved with counseling and medication. (Tr. 45, 53). She also noted speech therapy had helped, such that Plaintiff no longer needed the service. *Id.* Tucker testified Plaintiff started ADHD medication in

---

4. In this section, the undersigned summarizes Tucker's testimony regarding Plaintiff's functioning. Discussions regarding Tucker's right to representation and the ALJ's development of the record are discussed in greater detail below in the "Discussion" section.

2014. (Tr. 46). His medication had recently been increased "[b]ecause he was focusing but he was still all over the place . . . hitting others and not keeping his hands to hi[m]self." *Id*. Tucker was awaiting an appointment with an anger specialist through the Cuyahoga County Board of Disability. (Tr. 49). Plaintiff could be "very, very angry", and hit people, scream, run away, or throw tantrums. (Tr. 54).

ALJ Decision

In her written decision dated March 31, 2017, the ALJ found the most recent favorable medical decision finding Plaintiff disabled was dated March 21, 2011, and at the time of that decision, disability was based on malnutrition, marasmus, failure to thrive. (Tr. 15). The ALJ found medical improvement occurred as of November 1, 2014, and since that date, the impairment upon which disability was previously based did not meet or medically equal the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* The ALJ then found Plaintiff was a preschooler on November 1, 2014, and a school-age child at the time of the decision. *Id*. Next, the ALJ found Plaintiff's previous impairment did not functionally equal the listings since November 1, 2014. *Id.*

The ALJ co65ncluded that since November 1, 2014, Plaintiff had severe impairments of ADHD and a history of failure to thrive, but that these impairments – individually or in combination – did not meet the requirements of a listed impairment. (Tr. 21-22). Moreover, the ALJ found that Plaintiff's impairments did not functionally equal the listings. (Tr. 22). This was so because she found Plaintiff had marked limitation in attending and completing tasks, but less than marked limitation in acquiring and using information, interacting and relating with others, moving about and manipulating objects, and caring for self, and no limitation in health and physical well-being. (Tr. 27-31). Therefore, the ALJ found Plaintiff's disability ended as of November 1, 2014, and he had not become disabled again since that date. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

    1.      Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.    Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.    Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

## DISCUSSION

Tucker argues first, that the ALJ erred in failing to fully develop the record in light of her lack of representation, and second, that the ALJ erred in failing to find Plaintiff had marked

10

limitation in certain domains of functioning. For the reasons discussed below, the undersigned finds remand is required for the ALJ to fully and fairly develop the record.

Right to Representation

Tucker first argues she did not waive her right to representation and the ALJ should not have proceeded with the second hearing. The undersigned finds the ALJ fulfilled her duty to advise Tucker of her right to counsel.

When Plaintiff stopped receiving benefits, the state agency provided Tucker with information about how to appeal the decision, including a section entitled "If You Want Help With Your Appeal". (Tr. 108). In her request for reconsideration, Tucker acknowledged that Plaintiff "has a right to be represented and that if he needs representation, the Social Security office or hearing office can give him a list of legal referral and service organizations to assist him in locating a representative." (Tr. 111). The notice of denial of reconsideration contained a similar advisement (Tr. 133), as did the notice of hearing (Tr. 142, 146-47). Subsequently, at the first hearing, the ALJ explained Plaintiff's right to representation:

> I must make sure on the record that you understand your right to have a representative. I must inform you that while it is not required, you have the right to be represented by an attorney or other representative. A representative can help you collect information about your claim, submit evidence, explain medical terms, help protect your rights, and make any request or respond to any notice about these proceedings. A representative may not charge you a fee or receive a fee for your case unless we approve it. If you appoint a representative, you may be responsible for reimbursing your representative for certain expenses, such as the cost of getting or copying your medical records. Some legal service organizations offer legal representation free of charge if you meet their eligibility requirements. You also have the right to proceed without a representative. If you do so, I will collect the relevant medical and non-medical records and question you at the hearing. Nevertheless, a representative can present your evidence in a way that is most favorable to your case.

(Tr. 62-63).

11

After acknowledging that she understood, Tucker asked the ALJ to postpone the hearing to allow her time to get a representative. (Tr. 63-64). The ALJ then explained:

> I'm filling out a form we need to have you sign that acknowledges we're going to be postponing the hearing to allow you to get a representative and the minimum amount of time this will be postponed is 21 days, but it's very likely it's going to be much longer than that, so you do have a little bit of time to get a representative, although I'd start looking right away because what they do on these is say we'll put them in and reschedule it for the next time there's an opening, so . . . you know, there's no way to know when that might be.

(Tr. 65). The ALJ also told Tucker: "You should save that disc and allow [your representative] to see it, so he knows what we have already, and then it's his obligation to supplement with anything else that could be in the record." (Tr. 66). At the end of that hearing, the ALJ then stated, "We'll send you another notice of when [the hearing is] going to be, and then we'll just go forward at that time." (Tr. 67).

That same day, Tucker signed a document entitled "Acknowledgement of Postponement in Order to Obtain Representation." (Tr. 151). That document stated, *inter alia*:

> I have been advised, both orally and in writing, that if I do not have a representative by the time of the next scheduled hearing, I must be prepared to proceed with the hearing without a representative and, absent extraordinary circumstances, <u>no further postponement</u> will be granted in order for me to get a representative.

*Id.* (emphasis in original).[5]

At the second hearing, on August 9, 2016, Tucker again appeared without counsel, and had the following exchange with the ALJ:

ALJ:   . . . I note you do not have representation, is that correct?

WTN:  Yes.

---

5. In Reply, Tucker asserts that she "signed a generic postponement request and there is no indicating that she received a copy of the same." (Doc. 16, at 1). Generic or otherwise, the form contained the quoted language. *See* Tr. 151. Moreover, Tucker does not dispute that she signed it, and does not state she did not understand the document she signed.

ALJ:    We had a previous hearing. It was - - oh, I don't know if I have - - if I wrote the date down. We had a previous hearing scheduled and you appeared on that date and indicated that you preferred to postpone the hearing for the purpose of obtaining representation and you were informed at that time that when the hearing is rescheduled, that we'll go forward whether you have representation or not, and that's what we'll do today.

WTN: Okay.

(Tr. 38).

In *Thomas v. Commissioner of Social Security*, under similar circumstances, the Sixth Circuit held that "[t]he ALJ did not err by proceeding with the hearing, given that Thomas was notified on numerous occasions of her right to representation and that the ALJ had previously continued the hearing for several months to give Thomas the opportunity to obtain representation." 50 F. App'x 289, 290-91 (6th Cir. 2014); *see also Thomas v. Comm'r of Soc. Sec.*, 2013 WL 1250649, at *7-8 (E.D. Mich.) (describing underlying circumstances including: 1) notification of right to representation in denial of review, 2) notification of right to representation in notice of hearing, and 3) postponement of hearing for over three months).

The situation here is directly analogous to the one in *Thomas*. The ALJ informed Tucker of her right to obtain representation on Plaintiff's behalf, and allowed her four months in which to do so. Moreover, Tucker signed a form indicating she understood no further extensions would be granted for the purposes of obtaining representation. As the Sixth Circuit found no error under these circumstances in *Thomas*, the undersigned finds no error in the ALJ proceeding with the second hearing.

Duty to Develop Record

Next, Tucker contends the ALJ failed in her duty to develop the record given that Tucker proceeded *pro se*. The Commissioner responds that the ALJ adequately fulfilled her duty to fully develop the record, by inquiring of Tucker about additional evidence, and requesting additional

13

evidence on Plaintiff's behalf. (Doc. 15, at 10-15). The undersigned finds the ALJ did not fulfill her heightened duty to develop the record in this case, and thus recommends the case be remanded for further factual development and a new hearing.

"Social Security proceedings," as noted, "are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales,* 402 U.S. 389, 400–01 (1971)). The ALJ has a "special, heightened duty to develop the record," moreover, "when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures." *Nabours v. Comm'r of Soc. Sec.,* 50 F. App'x 272, 275 (6th Cir. 2002) (citing *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 856 (6th Cir. 1986)).

"To satisfy this special duty," the Sixth Circuit instructs, "the administrative law judge must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1052 (6th Cir. 1983) (internal quotation and citation omitted). The duty to develop the record is balanced, however, with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)). Although the Court must "scrutinize the record with care" where the claimant appears before the ALJ without counsel, the lack of counsel does not automatically result in reversal. *Lashley,* 708 F.2d at 1052. There is no bright-line rule, but rather the determination of whether an ALJ has failed to fully develop the record must be made on a case-by-case basis. *Id.*; *Cox v. Comm'r of Soc. Sec.,* 615 F. App'x 254, 262 (6th Cir. 2015).

14

The undersigned concludes the ALJ did not satisfy this "special duty" here based on several circumstances. First, Tucker's responses during the hearing suggested she was confused about the process and what evidence was already in the record:

ALJ:    And have you had an opportunity to review the record, the disc that you have?

WTN:    No.

ALJ:    Okay, when did you get the disc?

WTN:    Today.

ALJ:    Today?

WTN:    Um-hum.

ALJ:    And you have had the opportunity all of this time since you filed to come into the office to review the record and you have not done so?

WTN:    I did not know. Somebody called me from Social Security, that list on the 5th, the first hearing that we had, you gave a list of lawyers. I tried to call all those lawyers but they told me they couldn't take his case because he was already, he already had an open case and they just don't do those cases. I spoke to multiple lawyers and they actually gave me - - written up a letter stating that they wouldn't be even - - wouldn't be able to help me. I tried legal aid and everybody, but I couldn't get anyone and I did not know that they were supposed to mail me off a disc. I spoke to somebody from Social Security and she - - I never got the disc.

ALJ:    Okay. Well, let me just tell you briefly what's on here. This has the determinations that were made in the past, the determination that found him disabled and the termination that found him no longer disabled, and then there are the applications that you filed, the different papers that went with the applications, and then the last section is medical records. And this starts in - - the earliest is in 2010 and the latest we have is in November of 2015. Has he gone to the doctor since November of 2015?

WTN:    I actually did a medical release because I couldn't get a doctor - - I mean I couldn't get a lawyer myself. I called around to multiple lawyers, but I did a medical release myself to Social Security and the lady that I spoke to two weeks ago told me she would help me pull up these records, and his recent records.

> ALJ:   Well, who did you talk to? At Social Security, or this, this office the hearing office?
>
> WTN:  Social Security, they called me.
>
> ALJ:   Okay, and what happened after that?
>
> WTN:  She just asked me the name of the doctors, all the places he had been to, the kind of medication he was on, and to remind me of my appointment and she asked me did I have a lawyer and I told her the situation and she told me, well, let - - when I get here, let you know that I wasn't able to - - . . . but I definitely did put in - - the day that we left, I went to sign a medical release at his doctor.

(Tr. 39-40). Thus, it appears Plaintiff was not fully aware at the start of the hearing what was in the record. This in and of itself is not reversible error, but provides background for the below circumstances that the undersigned concludes require remand.

Second, the ALJ inquired of Tucker about who might have additional records relevant to Plaintiff's case:

> ALJ:   Okay, so we have a form that you filled out recently that lists two doctors, Vince Caringi . . . and Phyllis Elinson.
>
> WTN:  Yes, that's her.
>
> ALJ:   Okay, and these are the two people that he's seen since November. Has he seen anybody else?
>
> WTN:  Any doctors or counselors or?
>
> ALJ:   Right.
>
> WTN:  Just doctors?
>
> ALJ:   Just anybody else who would have information that could be helpful?
>
> WTN:  Yeah, he sees DeShawn, which is at the Center for Family Medicine. He's been to - -
>
> ALJ:   Okay, just a second.
>
> WTN:  Okay.

16

ALJ:   I want to put this down, okay then who else has . . . [Plaintiff] seen?

WTN:  Did you get Shawn?

ALJ:   No, what, what is that name? DeShawn?

WTN:  He's a counselor.

ALJ:   Is it D-E or - -

WTN:  Just Shawn.

ALJ:   Shawn . . . Do you know how, how that one is spelled?

WTN:  No.

ALJ:   Okay. And do you know the last name?

WTN:  No. But he's the only Shawn at the Center for Families and Children.

ALJ:   And Shawn is a counselor?

WTN:  Yes. He sees him weekly.

ALJ:   When did you start seeing Shawn?

WTN:  2014.

ALJ:   And what sorts of counseling does [Plaintiff] get?

WTN:  For behavior and anger. He also visits him at the school every week.

ALJ:   And what are - - what do those visits consist of? I mean why does he see
        him at school?

WTN:  Because he ha[s] behavioral problems, try to ask him how to work them out.
        I guess he sit[s] with him one-on-one in a room.

ALJ:   And you indicated there's somebody else that [Plaintiff] is seeing?

WTN:  Yeah, he's, he was Cuyahoga County Board of Disability, he sees for anger
        too, anger specialist of something, I don't know exactly what it's called but
        they had him in a support program and just did, I think it was the, I think it
        was some kind of specialist who did an evaluation on him to see was he still
        eligible. We just went through that a week ago. See, the lady I spoke, I had

> all those names and numbers down, and I gave her everything and she told me she was going to try to pull this information up from the LS doctor and - -

ALJ:   Well, I'm not sure that you talked to somebody here or somebody at one of the local offices.

WTN:   Oh, okay.

ALJ:   Because I didn't see any mention of it in the record that we have that they were checking on anything.

WTN:   So, it's not all connected?

ALJ:   No.

WTN:   Okay.

(Tr. 41-43).

After Tucker also identified Heather Rice, a nurse at the Centers for Families and Children, the ALJ explained:

ALJ:   All right, well, we'll have you sign a couple extra medical releases just so - - . . . you know, rather than counting on the office, whichever office you talked to, getting a hold of us and our finding them, and we'll try to send for some of these also.

(Tr. 44). After the hearing, the ALJ did, in fact, obtain records from the two physicians, one nurse, and Board of Disability that Tucker identified. *See* Tr. 602-12 (Dr. Elinson); Tr. 613-35 (Dr. Caringi); Tr. 636-51 (Ms. Rice); Tr. 652-69 (Board of Developmental Disabilities). Plaintiff is correct, however, that there is no indication in the current record that the ALJ made any effort to obtain records from the counselor, even though Plaintiff identified that he worked at the same facility as Dr. Caringi and Ms. Rice – The Centers for Families and Children. This failure is somewhat compounded by the lack of subsequent clarity (explained below) about whether Tucker was aware the ALJ did not obtain these records, despite her statement that she would attempt to do so. *See* Tr. 44.

After obtaining records from Dr. Elinson, Dr. Caringi, Ms. Rice, and the Board of Developmental Disabilities, the ALJ sent Plaintiff a letter in September 2016 with the additional records received, and explaining her rights to, *inter alia*: 1) submit written comments regarding the evidence; 2) request a supplemental hearing; and 3) request the submission of additional records. (Tr. 340-41). The letter required Plaintiff to respond within ten days of receipt, and stated if she did not do so, the ALJ would enter the new evidence in the record and issue a decision. (Tr. 341). Approximately three weeks later, someone with the hearing office contacted Tucker. (Tr. 342). The "Report of Contact" indicates the ALJ's letter was returned and Tucker explained she had a "problem with receiving mail due to having to share a mailbox." *Id.* The staff member told Tucker she "would send [p]roffer evidence to her today and expect it in mailing days [sic]. She has 10 day[s] to respond from today." *Id.* The record does not indicate any further follow up, or that Tucker submitted anything in response to this letter. However, in December 2016, Tucker submitted additional evidence, including a November 2016 Evaluation Team Report including evaluations and comments from Plaintiff's teachers and school psychologist. (Tr. 343-82).

From this record, it appears to the undersigned that Tucker would have understood the ALJ assumed a duty to seek to obtain records from Plaintiff's counselor, Shawn. And, it also appears Tucker may not have known the ALJ did not obtain those records, nor did the ALJ explain her failure to do so. The Sixth Circuit has found it reversible error when an ALJ promises to obtain records and does not do so. *See Strang v. Comm'r of Soc. Sec.*, 611 F. App'x 271, 276 (6th Cir. 2015).

In *Strang*, the ALJ represented to a claimant at his hearing that she would obtain certain recently created documents from the claimant's treating physician, and then failed to do so. There, the Sixth Circuit held that remand was warranted on this basis because "by telling [the plaintiff]

19

she would procure certain documents for the record and then failing to follow through, the ALJ effectively deprived [him] of a full and fair hearing." *Id.* at 275. The court acknowledged that the prejudice requirement meant that such claims were generally subject to a harmless-error analysis, but explained that

> [i]n a situation where the ALJ agrees to procure more information for the record and fails to do so, ... "[t]he lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits." This court has "no way of knowing whether the evidence from this case would sustain [the plaintiff's] contentions," but, "in the absence of proof to the contrary . . . we must assume that it does lend credence" to those contentions.

*Id.* at 276 (quoting *Brown v. Shalala*, 44 F.3d 931, 935–36 (11th Cir. 1995)); *see also Morgan v. Astrue*, 2010 WL 3723992, at *9 (E.D. Tenn.), *report and recommendation adopted*, 2010 WL 3723985 (E.D. Tenn.) ("Once an ALJ has communicated to a claimant that he will intervene and directly obtain the claimant's medical records from a medical care provider, the ALJ must follow through or else he will commit a procedural error that warrants remand. This is so because a claimant who has been told that his medical records will be obtained and considered by the ALJ will likely not make an effort on his own to obtain and submit the records. The claimant will simply trust that the ALJ will follow through. If the ALJ then fails to do so, the claimant clearly will be prejudiced."). The court in *Strang* further explained: "To ensure that the ALJ has fulfilled his duty to conduct an appropriate inquiry, he 'should include documentation of all attempts to obtain the evidence an exhibit in the record.'". 611 F. App'x at 276 (citing Soc. Sec. Admin., Office of Hearings & Appeals, HALLEX 1–2–5–1, Evidence—General (2008)). The undersigned recognizes that the circumstances in *Strang* were somewhat more compelling than those presented here – there, the ALJ emphasized repeatedly that the missing records were important to her decision. *See id.* at 276. Although the ALJ did not do the same here, Tucker identified Shawn as a counselor with the Centers for Families and Children who Plaintiff had seen since 2014 and who

also saw Plaintiff at school. (Tr. 42). And, Tucker testified Plaintiff had behavioral problems at school, resulting in her receiving almost daily phone calls or text messages from Plaintiff's teacher. (Tr. 51-53). Thus, records from a counselor who saw Plaintiff at school for these problems are certainly relevant to the effect of Plaintiff's impairments, and, the ALJ self-imposed a duty to obtain them at the hearing. Therefore, the undersigned finds the ALJ committed reversible error in not obtaining the records.[6]

Third, Plaintiff contends "[t]here is no indication that an effort was made to obtain any school records or request that a teacher complete a questionnaire". (Doc. 12, at 13). The relevant regulations dictate:

> (iii) School. If you go to school, *we will ask* for information from your teachers and other school personnel about how you are functioning there on a day-to-day basis compared to other children your age who do not have impairments. We will ask for any reports that the school may have that show the results of formal testing or that describe any special education instruction or services, including home-based instruction, or any accommodations provided in a regular classroom.

20 C.F.R. § 416.924a(a)(2)(iii) (emphasis added).

The record does not reflect that the ALJ requested updated school records after the hearing. However, as noted above, the ALJ did have educational records in the form of IEPs and Evaluation Team Reports pre-dating the hearing, and in the form of the later-submitted evidence from Plaintiff, which included a November 2016 Evaluation Team Report which included observations and testing from Plaintiff's teachers, and a school counselor (Tr. 344-50, 260-74), and an updated

---

6. Although the Commissioner generally asserts that the ALJ "made efforts to contact those providers to obtain additional medical records" (Doc. 15, at 15), she does not expressly address the missing records from the counselor, nor point to any evidence in the record suggesting the ALJ requested those records. And the cases she relies upon primarily address questions of the quality of an ALJ's questioning of an unrepresented claimant, rather than a failure of a promise to obtain records. *See Arnwine v. Comm'r of Soc. Sec.*, 2013 WL 3365137 (N.D. Ohio), *Taylor v. Colvin*, 2013 WL 6162527 (N.D. Ohio), *Clayton v. Colvin*, 2016 WL 4729193 (N.D. Ohio).

IEP (Tr. 375-82). Thus, although it does not appear the ALJ actively sought out such records, she did have them at the time of her decision. Given this information, the undersigned finds the ALJ did not reversibly err specifically with regard to obtaining additional school records.[7]

The determination of whether the ALJ has satisfied the duty to develop the record is not a bright-line rule, but one that must instead be made on a case-by-case basis. *Lashley*, 708 F.2d at 1052; *Cox*, 615 F. App'x at 262. Under the combination of circumstances presented in the instant case, the undersigned finds remand is required here. These circumstances are those described above – the lack of clarity in the record over whether Plaintiff received and understood her ability to respond to the later-obtained evidence, and the ALJ's failure to obtain records from Plaintiff's counselor (despite stating she would do so). Each of these circumstances alone might not prompt the undersigned to recommend remand, but taken together, the undersigned concludes the ALJ did not satisfy her heightened duty to develop the record with a *pro se* claimant. Remand is thus required. And, Tucker will presumably have the assistance of current counsel to ensure the remainder of the record is fully developed and that Tucker understands the proceedings.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the Commissioner's decision to deny SSI not supported by substantial evidence. Accordingly the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings consistent with the analysis herein.

 s/James R. Knepp II
United States Magistrate Judge

---

7. This is not to say that, on remand, Plaintiff could not submit additional relevant school records.

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).